UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TELLIS SEARS,

                Plaintiff,                Case No. 15-cv-14056

v                                           Honorable Thomas L. Ludington

COUNTY OF SAGINAW,

                Defendant.

_____/

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff Tellis Sears initiated this action against Defendant County of Saginaw by filing his complaint on November 19, 2015. Compl., ECF No. 1.  Plaintiff Sears alleges that Defendant showed deliberate indifference to his serious medical needs in violation of the Eighth Amendment by failing to treat an open wound on his right scrotum, perineum, and thigh region while he was incarcerated at the Saginaw County Jail. *Id.* Sears argues that this injury was the result of Defendant County of Saginaw's unlawful policy pursuant to 42 U.S.C. § 1983 and *Monell v. Department of Social Services of New York,* 436 U.S. 658 (1978). *Id*.

On August 15, 2016, Defendant County of Saginaw moved for summary judgment on Plaintiff's claim.  *See* Mot. Summ. J., ECF No. 37.  For the reasons stated below, Defendant's motion will be granted.

**I.**

Plaintiff Tellis Sears is a resident of Saginaw, Michigan. *See* Compl. ¶ 1.  Defendant County of Saginaw is a governmental entity within the State of Michigan that exercises supervising and governmental authority over the Saginaw County Jail (the "Jail"). *Id*. at ¶ 2.  The

Jail contracts with Corizon Healthcare Systems for the provision of jail medical services. *See* Geda Dep 3-4, ECF No. 45 Ex. 1. Under the contract, at least two nurses are available at the Jail at all times. *Id.* at 4-6. However, the facility medical provider and physician, Dr. Dennis M. Lloyd, D.O., is generally only present at the Jail on Fridays. *Id.* at 5-6. Registered Nurse Jeremy Geda testified that the Jail nurses are required to call Dr. Lloyd for any medical administration, including over the counter medicines. *Id.* at 10. Dr. Lloyd is always available by telephone on the days that he is not present at the Jail. *Id.* at 11.

### A.

On October 14, 2014 Plaintiff Tellis Sears was taken into the custody of the Saginaw County Jail after being charged with violating his probation, where he remained to await sentencing. *See* Compl. ¶ 5; Sears Dep. 13, ECF No. 37 Ex. D. At the time of his intake Sears did not have any serious or otherwise notable medical issues. *See* Jail Med. Rec. 001-003, ECF No. 37 Ex. B; Sears Dep. 13. Sears was placed in a cell that slept up to 12 inmates that included a toilet, sink, and shower. *See* Sears Dep. 41.

On October 19, 2014 Plaintiff informed jail medical staff that he had been experiencing constipation for a week. *See* Jail Med. Rec. 008. As a result, he was examined by Registered Nurse Jason Rickett. *Id.* Nurse Ricket then called Dr. Lloyd, who prescribed Plaintiff one bottle of magnesium citrate. *See* Lloyd Aff. Ex. A, ECF No. 37 Ex. C.

### B.

Plaintiff Sears did not report any further medical issues to the Jail staff until mid-November. In his deposition, Sears testified that, after noticing a cyst on his upper right groin on November 16 or 17, 2014, he sent around 10 notes, or "kites", to jail staff over the course of three days before receiving any medical attention. *See* Sears Dep. 15. This testimony is

somewhat at odds with Sears's medical records, which reflect that Sears was examined on November 16, 2014 at around 2:45 PM by Nurse Ricket after he complained of lower abdominal pain. *See* Jail Med. Rec. 012-013. Sears testified that he showed Nurse Ricket the lump on his groin and that Nurse Ricket informed him he had a hernia. *See* Sears Dep. 16. There is no corroboration of this conversation in the medical records. Instead, the records simply reflect that Sears complained of lower abdominal pain, was prescribed 200 milligrams of Ibuprofen three times a day for seven days, and that Nurse Ricket recommended that Dr. Lloyd review Plaintiff Sears's file. *See* Jail Med. Rec. 012-013. Sears's medical chart reflects that, pursuant to the prescription, he received ibuprofen three times a day for the duration of his time in the Jail. *Id.*at 21; Lloyd Aff. Ex. A.

Sears did not see another nurse until November 18, 2014 at around 1:30 PM when the cyst on his upper groin burst. *See* Jail Med. Rec. 014; Sears Dep. 16. Sears alleges that he received medical attention only after a guard noticed that his jumpsuit was covered in blood, after which he was taken to health services. Sears. Sears Dep. 37. The examining nurse, Nurse Kimberly Cheslik noted that Sears complained of a draining "hernia" on his right groin related to his ongoing abdominal pain. *See* Jail Med. Rec. 014; Cheslik Aff ¶¶ 3-6. Upon examining Plaintiff Sears, Nurse Cheslik observed that Sears had an abscess that was draining red, purulent fluid. *Id.* She also noted redness around the drainage site and approximately two to three centimeters of swelling, and that Sears was experiencing a temperature of 102.1º Fahrenheit. *Id*. After taking Sears's vital signs, Nurse Cheslik contacted Dr. Lloyd, who ordered Bactrim, Epsom salt soaks, and a wound culture. *See* Lloyd Aff. Ex. A. Sears was also instructed to continue taking "motrin;" a name that he appears to have been using interchangeably with the

"ibuprofen" previously prescribed. *Id.* Finally, Sears was scheduled for an appointment with Dr. Lloyd for Friday, November 21, 2014. *See* Jail Med. Rec. 015.

In the meantime, Sears was placed in a single cell to prevent the spread of any infection. *See* Sears. Dep. 20. Plaintiff Sears testified that, because his new cell did not have a shower and only had a sink, he had trouble using the Epsom salt soaks. *See* Sears Dep. 21-22. Nurse Jeremy Geda testified that in general patients were instructed to apply Epsom salt soaks using a warm, wet washcloth. *See* Geda Dep. 24-25. Sears attempted to use the salts in this way, but claimed that it was ineffective and that the wound continued to bleed. Sears Dep. 22.

Plaintiff Sears underwent a follow-up examination by Nurse Cheslik two days later, on November 20, 2014 at 2:00 PM. *See* Jail. Med. Rec. 016. Nurse Cheslik's progress notes from that examination provide as follows:

> Assessment complete on [right] inguinal abscess.[1] Contains moderate amount of red, thick drainage noted. Appears to have a noted tunnel present now.[2] Also noted a second open area. Scrotum is enlarged as well as reddened, edematous area on [right] anterior leg. Spoke to Dr. Lloyd who advised to send to ER for treatment.

*Id*. Dr. Lloyd corroborates this report in his affidavit, stating that upon receiving Nurse Chelsik's telephone call he ordered that Plaintiff Sears be taken to the emergency room as soon as possible because his condition was worsening. *See* Lloyd Aff. ¶ 10; Lloyd Aff. Ex. A. As a result, Sears was immediately taken to the St. Mary's of Michigan Hospital emergency room. *See* St. Mary's Med. Rec. 001, ECF No. 37 Ex. F.

---

[1] An "abscess" is "a localized collection of puss and necrotic tissue anywhere in the body surrounded and walled off by damaged and inflamed tissues." OXFORD CONCISE MEDICAL DICTIONARY (9th ed. 2016). "Inguinal," in turn, is an adjective meaning "relating to or affecting the region of the groin." *Id*.

[2] According to Dr. Floyd, "tunneling" is a term used to describe a spreading infection.

Upon arriving, Sears reported that he was experiencing fever, chills, abdominal pain, and constipation. *Id*. at 002. His physical exam reflected

> a large area of erythema[3] and induration[4] in the right groin with an area of opening and minimal drainage, cellulitic changes to extend over the right hip and pelvis as well as the anterior right thigh and into the right scrotum. The right scrotum is indurated and mildly swollen and the testes is [sic] mildly tender, there is no apparent crepitus[5] or foul odor.

*Id*. at 003. Among other tests, Sears underwent a CT scan that revealed "cellulitis and groin abscess." *Id*. at 004. Specifically, the CT scan suggested a "[s]oft tissue infection involving the scrotum, the perineum, and the anteromedial aspect of the right pelvis and the right proximal thigh ….Scattered foci of gas are also identified …and is concerning for underlying Fournier's gangrene.[6] There may also be a developing abscess in the region of the right scrotum." *Id*. at 005.

On the following day, September 21, 2014, Sears underwent a surgical debridement and irrigation of the infected area. *Id*. at 010. The operating surgeon, Doctor Samer Kais, M.D., rendered a post-operative diagnosis of Fournier's gangrene. *Id*. After six days of post-operative monitoring, Plaintiff Sears was discharged from the hospital on November 28, 2014. Because Sears had been released from custody, he was not required to return to the jail. *See* Sears Dep. 23.

---

[3] "Erythema" is defined as the "flushing of the skin due to dilatation of the blood capillaries in the dermis. It may be physiological or a sign of inflammation or infection." OXFORD CONCISE MEDICAL DICTIONARY (9th ed. 2016).

[4] "Induration" is defined as the "abnormal hardening of a tissue or organ." OXFORD CONCISE MEDICAL DICTIONARY (9th ed. 2016).

[5] "Crepitus" refers to a crackling sound or grating feeling. OXFORD CONCISE MEDICAL DICTIONARY (9th ed. 2016).

[6] "Fournier's gangrene" is a rare but potentially life-threatening infection of the scrotum that can rapidly spread to involve the perineum, penis, and anterior abdominal wall." OXFORD CONCISE MEDICAL DICTIONARY (9th ed. 2016).

While Plaintiff did not experience any major post-surgical complications, at the time of his deposition he claimed to experience some pain and numbness in his leg and difficulty urinating. *Id*. at 26.  He also testified that he has difficulty being physically active, performing certain jobs, and playing with his children. *Id*. at 26-28.

## II.

Plaintiff now moves for summary judgment on Plaintiff's § 1983 claim.  A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).

The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Defendant argues that Plaintiff has not demonstrated that Defendant – a municipality – is liable for Plaintiff's injuries.  Defendant also argues that Plaintiff has not established causation.

## A.

By its terms, the Eighth Amendment prohibits the imposition of any cruel and unusual punishment. At the time of its adoption, "cruel and unusual punishment" included draconian punishments such as the rack, thumbscrews, "tortures[,] and other barbarous methods of punishment." *Gregg v. Georgia*, 428 U.S. 153, 170 (1976) (internal quotation marks and citation omitted). Since then, Eighth Amendment jurisprudence has not remained static, but instead has been subject to "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100 (1958). Under this evolving standard, the Supreme Court has recognized the requirement that prison officials "provide medical care for those whom it is punishing by incarceration," and a prohibition against deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). This includes a prohibition against deliberate indifference to a prisoner's serious medical needs, meaning the "unnecessary and wanton infliction of pain." *Id.* at 104 (internal quotations and citation are omitted). This standard has been applied to pre-trial detainees such as Sears under the Due Process Clause of the Fourteenth Amendment. *See Jones v. Muskegon County*, 625 F.3d 935, 941 (6th Cir. 2010).

To demonstrate a claim of deliberate indifference, a plaintiff must meet an objective component and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). First, he must show that he has an objectively "sufficiently serious" medical need. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Farmer*, 511 U.S. at 834). Second, he must show that the prison official had a subjectively "sufficiently culpable state of mind." *Id.* (quoting *Farmer*, 511 U.S. at 834). Here, Defendant does not dispute that Plaintiff experienced a "sufficiently serious" medical need.

The second requirement requires a Plaintiff to show more than "mere negligence." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). Instead, a plaintiff must show the "equivalent of recklessly disregarding [a substantial risk of serious harm to a prisoner]." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009). Where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound is state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004). It is only "[w]hen prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay" violates the Eighth Amendment. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004).

**B.**

Plaintiff has not brought a claim against any named prison official. Instead, the sole defendant is the County of Saginaw. In *Monell v. Department of Social Services of New York*, the Supreme Court held that municipalities are "persons" subject to suit under 42 U.S.C.A. § 1983. *Monell*, 436 U.S. at 700-01. Such a claim may only be brought when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The Sixth Circuit has instructed that, to satisfy the requirements of *Monell*, a plaintiff "must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dept.*, 8 F.3d 358, 364 (6th Cir. 1993) (internal citations and quotations omitted).

Accordingly, to succeed on a *Monell* claim, a plaintiff first must allege that the municipality itself caused a constitutional tort. *Monell*, 436 U.S. 658 at 691. A municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id*.

Second, a Plaintiff must show that the alleged conduct qualifies as a policy. *Monell* municipal liability may attach where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. *Monell* liability may also attach where a plaintiff alleges "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id*. at 690-91. Municipal liability may also attach for policies promulgated by the official vested with final policymaking authority for the municipality. *See Miller*, 408 F.3d at 813 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83, 106 (1986). This second element requires a plaintiff to show "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Third, a plaintiff must show causation. In other words, a plaintiff must connect the municipality's policy to the particular injury alleged.

**III.**

**A.**

In support of its § 1983 claim against Defendant County of Saginaw, Plaintiff alleges that Defendant's policy of having a jail physician present only one day per week amounted to

deliberate indifference to Plaintiff Sears's serious medical needs. Defendant does not deny that it maintains such a policy, but argues that the policy is not unconstitutionally inadequate. In support of this argument Defendant emphasizes *Shehee v. Saginaw County*, 86 F.Supp 3d 704, (E.D. Mich. 2015) in which a court in this district determined that "Lloyd's practices of limited contact, occasional care, and phoned-in treatment did not display the subjective disregard for [the plaintiff's] well being that characterizes deliberate indifference." *Id*. at 714. However, the court in *Shehee* also noted that "Dr. Lloyd's practice of phoning in medical care raises significant concerns." *Id*. at 715.

Plaintiff's argument is slightly different from the argument presented in *Shehee*. There, the plaintiff conceded that Dr. Lloyd had provided him with medical care but argued that the care was inadequate. Here, Plaintiff Sears argues that the policy of having Dr. Lloyd present only once per week resulted in Plaintiff receiving *no medical treatment at all*. In support of this argument, Plaintiff cites Michigan Compiled Law § 333.16109(2), governing circumstances in which a licensed physician is permitted to delegate health care decisions to a nurse under his or her supervision. That statute requires that the following conditions be met:

- (a) The continuous availability of direct communication in person or by radio, telephone, or telecommunication between the supervised individual and a licensed health professional.

- (b) The availability of a licensed health professional on a regularly scheduled basis to review the practice of the supervised individual, to provide consultation to the supervised individual, to review records, and to further educate the supervised individual in the performance of the individual's functions.

- (c) The provision by the licensed supervising health professional of predetermined procedures and drug protocol.

Mich. Comp. Laws Ann. § 333.16109. Contrary to Plaintiff's assertions, the record – and the very deposition transcript cited by Plaintiff – demonstrates that all three of these conditions were satisfied.

As to the first prong, Nurse Geda testified that Dr. Lloyd is continuously available to the nurses by telephone, and that he had "yet to not be able to get ahold of Dr. Lloyd" and that in his three years at the jail "when I've needed to contact him, I've gotten a response either immediately or within 5 to 20 minutes he's called back." *See* Geda Dep. 11. Plaintiff has not pointed to any place in the record that contradicts this testimony. As to the second prong, it is undisputed that Dr. Lloyd is present at the jail each Friday to review files, consult with the nursing staff, and attend appointments with jail inmates. Finally, as to the third prong, Nurse Geda testified that it is jail protocol to confer with Dr. Lloyd for all medical issues and to receive verbal commitment for all medical decisions, including over-the-counter drug administration such as Tylenol. *See* Geda Dep. at 7-10. The nursing staff also keeps charts for Dr. Lloyd to review when he is present on Fridays. *See id.* 10. These practices constitute predetermined procedures and drug protocols, and, again, Plaintiff has not pointed to any part of the record that creates a material issue of fact regarding this testimony.

Because Dr. Lloyd provided proper supervision to the nursing staff pursuant to § 333.16109(2), Plaintiff's argument that he did not receive any medical treatment is without merit. And because Plaintiff received some medical treatment – meeting with nursing staff and obtaining medication on November 16 and November 18, 2014 and being referred to the emergency room on November 20, 2014 – he faces a high bar to show that the treatment was inadequate. *See Graham,* 358 F.3d at 385. Plaintiff must show that Defendant "rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment." *Id*.

(internal quotations and citations omitted). Plaintiff has not raised any such arguments in its response to Defendant's motion for summary judgment (arguing only that Defendant provided no medical care whatsoever). Plaintiff therefore has not met its burden of creating a material factual dispute regarding whether Defendant was deliberately indifferent to Plaintiff Sears's serious medical need. Summary judgment in favor of Defendant is thus appropriate.

**B.**

In its second argument, Defendant argues that Plaintiff Sears cannot establish causation because Plaintiff has not offered any expert testimony to refute the testimony of Defendant's experts. However, because Plaintiff has not demonstrated that Defendant's custom or policy resulted in deliberate indifference to his serious medical needs, this Court will not reach the question of causation.

**V.**

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 37, is **GRANTED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: October 31, 2016

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 31, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager